## AFFIDAVIT

I, Matthew Langille, having been duly sworn, do hereby state:

1.       I am a Special Agent with the Department of Homeland Security ("DHS"),
Homeland Security Investigations ("HSI") and have been so since August 2007.   As such, I am
an investigative or law enforcement officer of the United States within the meaning 18 U.S.C.
§2510(7), and an officer of the United States who is empowered by law to conduct investigations
of, and to make arrests for, offenses enumerated in 18 U.S.C. §2516.   I have been assigned to
the Special Agent in Charge ("SAC"), New England since December 2011.   I am currently
assigned to the Human Rights Violators and War Crimes National Security Unit and have been
since 2018.   Prior to my current assignment I was assigned to the SAC in New York, NY.
Since joining HSI, my duties have included investigating criminal violations of Titles 18 and 21
of the United States Code, primarily those related to customs, immigration, and narcotics laws, to
include, but not limited to, human rights violators and war criminals.   During the course of my
employment with HSI, I have received training regarding the activities of human rights violators
and war criminals, including identifying individual persons who have engaged in genocide, war
crimes, and/or torture.   I have participated in all aspects of human rights violator and war crimes
investigations, including interviewing witnesses and suspects, conducting surveillance, and
reviewing documents, among other things.   I have also participated in the execution of
numerous search warrants in residences and other locations seeking illegally obtained
immigration or naturalization documents, documents reflecting identity, and other evidence of
crimes.   I am familiar with the process by which refugees apply to come to the United States.   I

1

am also familiar with the process by which an alien obtains Lawful Permanent Resident ("LPR") status and adjusts status to become an United States citizen.

2.      I am submitting this Affidavit in support of an application for a criminal complaint charging KEMAL MRNDZIC, also known as "Kemo" ("MRNDZIC"), with violations of: 18 U.S.C. §1001(a)(1) (falsifying, concealing, and covering up a material fact by trick, scheme, or device); 18 U.S.C. §1542 (use of a fraudulently obtained passport); 18 U.S.C. §1051(c) (use of a fraudulently obtained naturalization certificate); and 18 U.S.C. §1546(a) (possession and use of a fraudulently obtained authorization document).

3.      The statements contained in this Affidavit are based on my own investigation, including interviews of victims, and upon information provided to me by other law enforcement officials in the United States, the Republic of Bosnia and Herzegovina, the Republic of Serbia, information and evidence obtained from The International Criminal Tribunal for the Former Yugoslavia, and other sources.   This Affidavit is submitted for the limited purpose of establishing probable cause to conclude that MRNDZIC committed violations of the statutes identified in the previous paragraph.   It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

## Background: The Bosnian War

4.      In the spring of 1992, the Republic of Bosnia and Herzegovina ("BiH") declared its independence from the Socialist Federal Republic of Yugoslavia ("SFRY").   Shortly thereafter, armed conflict broke out among the country's three primary sectarian groups: Bosnian Serbs who were primarily Orthodox Christian; Bosnian Croats, who were primarily Roman

2

Catholic; and Bosnian Muslims, also referred to as Bosniaks.   The military conflict consumed the country until late 1995.   War crimes, crimes against humanity, genocide, and breaches of the Geneva Conventions were found to have been committed on a broad scale during the conflict. Those crimes included the detention, persecution, torture, and murder of civilians based on their religion and ethnicity.   The International Criminal Tribunal for the Former Yugoslavia ("ICTY"), a criminal trial court established by the United Nations Security Council, attributed war crimes and breaches of the Geneva Conventions to the armed factions representing each of the three sectarian groups fighting in the territory of BiH.

5.      The Municipality of Konjic is located in northern Herzegovina and is on a strategic land route between Sarajevo to the north and Mostar to the south.   Prior to the armed conflict, Konjic was an ethnically diverse community populated primarily by Bosniaks (54% of the municipality) and Croats (26%); Serbs were a minority of Konjic's population (15%).   At the onset of war, the local Territorial Defense (TO) units based in Konjic were largely staffed by, and aligned with, Bosniaks and Croats.   In or about April 1992, armed conflict broke out between the Territorial Defense and Croat forces on one side, and Serb forces (supported by the Yugoslav Peoples Army ("JNA")) which had taken up positions in the mountains around Konjic.

6.      In or about May 1992, the Bosniak and Croat authorities in Konjic decided to remove and detain Serb men living in Konjic and the surrounding villages.   Between on or about May and December 1992, these authorities established and operated a prison camp at a former JNA military fuel storage facility in a village named Čelebići.   This camp was used by Bosniaks and Croats to detain Serbs including many non-combatant civilians, elderly men, and a small

number of women, all of whom were captured and detained in and around Konjic.   During the operation of the Čelebići camp, several hundred Serb men and women were held captive in the camp.



*Čelebići Camp, 1992*

7.      The ICTY, as well as other international organizations, documented the systematic persecution, beating, torture, and starvation of Serb detainees by guards at the Čelebići camp during its operation.   The ICTY also documented murders, rapes, and other sexual abuse of Serb men and women by those guarding the Čelebići camp.   In addition,

4

according to survivor accounts, camp guards would routinely direct anti-Serb ethnic slurs at the prisoners while they were beating them, calling them "Chetniks," shouting "Auschwitz, Auschwitz" at the prisoners to intimidate them, telling prisoners they would never leave the camp alive, and, at times, hailing each other with the Nazi "Sieg Heil" salute.

8.      The prison conditions at Čelebići were exceptionally harsh. Hundreds of prisoners were forced to sit in rows, shoulder to shoulder on the concrete floor of a large metal hangar (known as "Hangar 6") for months.   They slept on the same concrete spot, without blankets or bedding.   They were fed minimal rations, defecated in a trench behind the hangar under armed guard (if they were able to defecate at all due to their starvation), and rarely washed.

9.      Dozens of other prisoners were forced into a long lightless underground tunnel (known as "Tunnel 9") where they sat shoulder to shoulder on the concrete floor.   The tunnel was insufficiently wide to lie out straight at night, and the men were so tightly packed that if one man had to turn over, all those around him had to do the same.

10.     The crimes committed by guards at Čelebići were widely known to the international community prior to 1998.   Among other things, in 1996, the ICTY indicted four individuals, including two of the camp leaders and one camp guard, for crimes committed at Čelebići against the Serb prisoners.   They were charged with committing numerous murders, torture, beatings, sexual assaults, and starvation of detainees at the camp.   Three of these individuals, Zdravko Mucic ("Mucic"), Hazim Delic ("Delic"), and Esad Landzo ("Landzo"),

were convicted after a public trial in The Hague which commenced in March 1997 and was
completed in the fall of 1998.[1]   Numerous Čelebići survivors testified at that trial.

### The Defendant & Čelebići Prison Camp

11.     The defendant, KEMAL MRNDZIC a/k/a "Kemo," is a Bosniak born, raised, and
educated in Konjic.   MRNDZIC entered military service with the territorial army in Konjic at
the outset of the war in the spring of 1992.   In or about June 1992, MRNDCZIC was assigned to
the Čelebići prison camp as a guard, where he served alongside Mucic, Delic, and Landzo – all
of whom were subsequently convicted for atrocities they committed while at Čelebići.   From on
or about June 1992 to on or about December 1992, when the camp closed, MRNDZIC
supervised guards at the Čelebići camp.

12.     As noted above, the ICTY concluded that crimes and other atrocities, including
murder, torture, beatings, and deprivation of food and basic sanitation facilities, were committed
against Serb captives throughout MRNDZIC's tenure as a guard and supervisor at Čelebići.
Among other things, numerous survivors have recounted daily beatings by the guards at the
camp – some committed at night on a few prisoners at a time, and others committed against large
groups of prisoners in the broad daylight.   One survivor recently recounted that the screams
from prisoners at the camp caused by the beatings were loud enough to carry for "kilometers."
Numerous survivors reported nearly nightly beatings of prisoners, who would be called out from

---

[1]  The judgment in that case, which provides great detail about the larger conflict as well as the operation of
the Čelebići camp, can be found at PROSECUTOR v. ZEJNIL DELALIC, ZDRAVKO MUCIC also known as
"PAVO," HAZIM DELIC, and ESAD LANDZO also known as "ZENGA," ICTY Case No. IT-96-21 (16
November 1998) (https://www.icty.org/x/cases/mucic/tjug/en/).

Hangar 6 or Tunnel 9 where they were held captive, and assaulted by guards and others just outside the doors.   Dozens of survivors have recounted hearing beatings and other violent abuse, as well as screams of those prisoners selected to be beaten and abused at night.   Persecution of Serbs at Čelebići was pervasive and obvious to every prisoner and every guard at the camp.

13.     More than a dozen camp survivors -- in statements and testimony they gave to the ICTY, in interviews with other non-governmental organizations, and, more recently, in interviews with HSI – recounted MRNDZIC's role in beating, threatening, abusing or otherwise persecuting Serb prisoners.   For instance, six survivors of Čelebići persecution separately said MRNDZIC participated in the most notorious mass beating at the camp which occurred in August 1992, shortly after the International Committee for the Red Cross ("ICRC") visited the camp.   The mass beating was in apparent retribution for prisoners telling ICRC representatives about the extremely harsh conditions at the camp.   One of those survivors recounted how he was savagely beaten during this mass beating, and how, after he had collapsed on the ground, MRNDZIC grabbed him by the hair and told him that no one would leave the camp alive. MRNDZIC also called him a "Chetnik mother fucker," using an ethnic slur used against Serbs.

14.     Three other survivors separately recounted MRNDZIC's use of "karate" to beat prisoners, and to practice his martial arts strikes.   One of those targeted by MRNDZIC for "karate" strikes described MRNDZIC as a "particularly vicious" guard because he selected and beat prisoners on his own initiative rather than being ordered to do so.

15.     While MRNDZIC was not a defendant in the ICTY prosecution, three survivors testified at the ICTY trial about MRNDZIC's participation in the persecution of prisoners along

with the charged defendants.   One testifying survivor recounted MRNDZIC's participation in

the survivor's beating on four consecutive nights, during which guards used planks and an

automatic rifle to strike him.   A second testifying survivor recounted how he was interrogated

by MRNDZIC, Landzo, and one other guard while they kicked him, and about MRNDZIC's

participation in a second mass beating at the camp after a Muslim police officer had been killed

in a nearby village.   The third witness testified to MRNDZIC's participation in beating prisoners

after the ICRC visit, and MRNDZIC's other maltreatment of prisoners such as slapping them or

spitting on them.

16.   In addition to the violence perpetrated against them by MRNDZIC and other

guards, numerous survivors reported extended periods of deprivation of food, saying that at

times they were not fed for days, while at other times they would receive only small piece of

bread and a spoonful of soup one or two times a day.   Many survivors reported losing one-third

or more of their body weight while interned at the camp.

17.   After the Čelebići camp closed in or about December 1992, MRNDZIC continued

to serve in the military until the end of the war in or about late 1995.   Among other assignments,

in or about 1994, MRNDZIC was promoted to serve as the commander of the Musala detention

camp, another location where Serbs (and later, Croats) were detained in the Municipality of

Konjic.   Persecution and other abuses were committed by guards at Musala during the course of

the Bosnian War.[2]

_____

[2] While I am currently not aware of any allegation that MRNDZIC participated the persecution of Serbs
while the commander of the Musala camp, the fact that he acted as the commander of that camp during the Bosnian

**ICTY Investigation**

18.     Shortly after the end of the Bosnian War, in October 1996, investigators for the
ICTY located MRNDZIC to take a signed statement from him regarding the crimes committed at
the Čelebići prison camp.   MRNDZIC gave a signed statement to ICTY investigators in
Sarajevo, BiH on October 17, 1996.   MRNDZIC told them that he was born in, and was a life-
long resident of, Konjic.   He said that in April 1992, he reported for military service at the
territorial army office in Konjic.   He admitted that he "was in charge of the security in Čelebići
camp from June 1992 until December 1992," and then stayed at the camp for two weeks after it
closed, departing in January 1993.   In the signed statement he provided to ICTY investigators,
he falsely claimed that during his time in the camp, "I have never seen any mistreatment,
beatings, killings, rapes.   I have even never heard about these incidents."   He admitted to
knowing about one death of a prisoner, whom he claimed was shot because the prisoner tried to
escape.   MRNDZIC also falsely claimed that there were no civilians detained at the camp, and
that, "[t]he prisoners were provided three meals a day.   The food was similar to the rations we
received.   Lu[n]ch and dinner were hot meals."

19.     On or about October 26, 1996, MRNDZIC was interviewed and gave a signed
statement to the defense team representing a notoriously brutal Čelebići guard, Esad Landzo, in

_____

War would have been material to immigration officials' assessment of his refugee application, and subsequent
applications for lawful permanent residence and citizenship.

connection with Landzo's prosecution by the ICTY.   MRNDZIC again admitted that shortly

after he arrived at Čelebići he was "put in charge of the guard relief."   MRNDZIC gave

evidence supporting Landzo's defense.   MRNDZIC recounted knowing his fellow guard,

Landzo, since childhood, and recounted Landzo's alleged frailties including bronchitis, his

inability to engage in physical activity for any length of time because of shortness of breath, his

physical disabilities, his use of alcohol and pills, and his withdrawn nature.   MRNDZIC also

claimed that he did not know that Landzo "abused the prisoners or murdered someone."   He

again falsely denied seeing, "a murder, physical abuse, torture, rape, or anything like that [at

Čelebići]."   By contrast, the testimony presented at the subsequent ICTY trial revealed that

Landzo routinely and openly abused prisoners using all types of objects, burned their tongues

with heated metal, poured flammable liquid on prisoners' limbs and lit it, tied fuse cord to a

prisoner's genitals and lit it, and fired blank rounds from firearms at prisoners to intimidate them.

Even in recent HSI interviews of survivors, they could vividly recount Landzo's flagrant violent

abuse of prisoners.

20.    On or about November 13 [1996], MRNDZIC executed a supplementary witness

statement for Landzo's defense team.   In that statement, MRNDZIC stated that the ICTY

investigator who took his statement on October 17, 1996, had accused him of lying about his

statements regarding Čelebići prison camp.   MRNDZIC also stated that the ICTY investigator

told him that, "the Tribunal knows and there is proof that [he] was involved in the alleged

murder" of a prisoner at Čelebići.   MRNDZIC also stated that, "the attitude of the [ICTY]

investigator made me sick with resignation."

**The Defendant's Flight and Fraudulent Refugee Application**

21.     After his signed statements in October and November 1996, in connection with

the ICTY investigation, and the alleged accusation of an ICTY investigator implicating him in

the murder of a prisoner at Čelebići, MRNDZIC sought a means of fleeing BiH.   In his quest to

leave BiH, he conferred with an individual referred to herein as "AZ," a person who had served

with MRNDZIC in a related military police unit during the Bosnian War (but not at Čelebići or

Musala), as to the best means of emigrating to another country.   AZ, who was also a Bosniak

living in and around Konjic, and who had served in the BiH military throughout the war, was

also seeking to emigrate from BiH.   AZ ultimately agreed to assist MRNDZIC leave BiH once

AZ was approved to emigrate to the United States.

22.     AZ was admitted to the United States in September 1997.   Within weeks of his

arrival in the United States, AZ completed an "Affidavit of Relationship" in support of

MRNDZIC's effort to become a refugee, in which AZ falsely claimed he was MRNDZIC's half-

brother, and that MRNDZIC was living as an asylee in Croatia rather than as a resident of BiH.

23.     On a date unknown but prior to March 1, 1998, MRNDZIC crossed into the

bordering Republic of Croatia with the aim of fraudulently applying as a refugee to the United

States.[3]   On or about March 1, 1998, in connection with an application as a refugee to the

---

[3] A person outside the United States may seek admission to the Unites States as a refugee by demonstrating
that they are unable or unwilling to return to their home because of past persecution, or a well-founded fear of future
persecution, on account of their race, religion, nationality, membership in a particular social group, or political
opinion.   Those persons who have ordered, incited, assisted, or otherwise participated (directly or indirectly) in the

United States, MRNDZIC completed and signed a United States Department of Justice, Immigration and Naturalization form titled, "Registration for Immigration Status Approval," as well as written answers to a supplemental questionnaire.   In the form and related forms, MRNDZIC fabricated his personal history so as to qualify as a refugee to the United States. Instead of admitting he was from the multi-ethnic municipality of Konjic and that he served in the BiH military throughout the war, he falsely claimed that he was from the Serb-dominated town of Nevesinje, BiH, and, as a Muslim, had been captured and imprisoned by Serbs at the outset of the war.   He provided a detailed false statement regarding his alleged capture and detention in Nevesinje by Serb forces in 1992, his interrogation and beating by Serb forces, other forced labor and mistreatment by Serb forces, and his ultimate escape from the Serbs in August 1992.   MRNDZIC falsely claimed that he feared a "return" to his home in Nevesinje where he said he would be mistreated, persecuted, and imprisoned by the Serbs in that area, in part because of his alleged escape from their captivity and also because he was a Muslim.   In sum, MRNDZIC falsely claimed to have been the target of the type of persecution which he perpetrated on others.   MRNDZIC also falsely claimed he had a half-brother living in Massachusetts (AZ), whom he wanted to join.

---

persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion are prohibited from qualifying as a refugee to the United States.   At all times material to this complaint, applicants seeking refuge in the United States had to complete a Registration for Classification as Refugee (Form I-590), a Biographical Information form (Form G-325C), and other related forms, signing and certifying the truthful contents of those forms.   Approval to enter the United States as a refugee was granted only after a review of the contents of these completed forms and an interview by an United States immigration officer. A spouse of an individual who qualifies as a refugee may also be admitted to the United States as a derivative refugee without independently demonstrating that they have been the subject of persecution or are in fear of persecution.

24.     On or about April 8, 1998, in furtherance of his refugee application, MRNDZIC executed a U.S. Department of Justice Biographic Information form (Form 325-C).   In that form, he falsely identified his mother, and falsely stated that he lived in Nevesinje until August 1992, and lived in a refugee camp in Jablanica until he deserted and escaped to Croatia in May 1994.   On that same day, in connection with his refugee application, he executed a form, falsely claiming that he had a half-brother (AZ) living in the United States, and that his mother was "SIZ."   In fact, AZ was not related to MRNDZIC by birth or by marriage.   In addition, "SIZ" was not MRNDZIC's mother.

25.     On or about November 30, 1998, MRNDZIC appeared before a United States immigration official in Split, Croatia, and executed a Form I-590, a Department of Justice Registration for Classification as a Refugee.   In that form and an attached written statement, MRNDZIC again fabricated his personal history, falsely claiming: he was a life-long resident of Nevesinje; he was detained as a Muslim civilian by Serb soldiers, beaten and threatened by them, and forced into manual labor; he escaped Serb detention in August 1992; he was first mobilized in the BH army in 1993; and in 1994 he deserted the army and fled to Croatia.   MRNDZIC also falsely claimed he had a close relative "HALF-BRO" in Lynn, Massachusetts and that, "I cannot ever return to my home in Nevesinje . . . I believe the Serbs may kill me if I tried to return . . . I would like to resettle to the US . . . and be reunited with my brother. "

26.     On or about November 30, 1998, MRNDZIC also executed a Sworn Statement of Refugee Applying for Entry into the United States (Form G-646).   In that form, MRNDZIC

falsely attested, "I have never ordered, assisted or otherwise participated in the persecution of any person because of race, religion, or political opinion."

27.     On or about November 30, 1998, MRNDZIC was interviewed by a United States immigration official.   MRNDZIC repeated many of the false statements he included in his Form I-590, including that he could never return home for fear of being persecuted as a Muslim, and that his military service only included working in anti-aircraft monitoring.   At the conclusion of the interview, and upon review of his completed Forms I-590 and G-646, the immigration officer approved MRNDZIC's application as a refugee.   In so doing, the immigration officer relied on MRNDZIC's written and oral false statements. The immigration official also approved MRNDZIC's spouse for admission as a derivative applicant based on MRNDZIC's false statements about himself.

28.     On or about March 4, 1999, MRNDZIC was granted entry to the United States as a refugee. MRNDZIC entered the country at John F. Kennedy International Airport in New York, and took up residence in Lynn, Massachusetts.   MRNDZIC's wife was also admitted to the United States that day as an accompanying spouse.

29.     At the time of his admission to the United States, MRNDZIC was also granted permission to work upon entry to the United States.   Shortly after his arrival, he applied for, and received a Social Security number and card (No. ***-**-1929).

**The Defendant's Fraudulent Application for Permanent Residency**

14

30.     In April 2008, MRNDZIC sought to become a lawful permanent resident of the United States.[4]   On or about April 7, 2008, MRNDZIC executed a Form I-485 in support of his application for lawful permanent residence.   In that Form I-485, MRNDZIC falsely claimed under penalty of perjury that: he only served in BiH's military from 1993-1994; he had never knowingly committed a crime of moral turpitude for which he had not been arrested (No. 1.a.); and he had not "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured . . . documentation, entry into the United States or any other immigration benefit." (No.10).

31.     On or about April 7, 2008, MRNDZIC also executed a Form G-325A in support of his application for lawful permanent residence.   In that Form G-325A, MRNDZIC falsely claimed that he lived and worked in Croatia from 1994 to 1999, and that his mother was SIZ.

32.     MRNDZIC's application for lawful permanent residence was approved on or about October 21, 2008, based in part on his false statements, and his continued concealment of his role at the Čelebići detention camp.   MRNDZIC's lawful permanent residence status was applied retroactively to his original admission date of March 4, 1999.

### The Defendant's Fraudulent Application for U.S. Citizenship

---

[4] A person granted refugee status may apply for lawful permanent residence in the United States after one year of continuous presence in the United States after that person has been admitted as a refugee.   At times material to this complaint, the refugee was required to complete and file an Application to Register Permanent Residence or Adjust Status (Form I-485).   On that form the applicant must certify, under penalty of perjury, that the application and information submitted with the application are true and correct.   If the Form I-485 is approved, the refugee status is adjusted to that of a lawful permanent resident, commonly referred to as a "green card holder."   A lawful permanent resident is entitled to live and work in the United States indefinitely and apply for United States citizenship should the permanent resident desire.

33.     Shortly after MRNDZIC fraudulently obtained his lawful permanent residency, he

sought to become a United States citizen.[5]   On or about December 5, 2008, MRNDZIC

executed a Form N-400.   On that form, MRNDZIC falsely declared under penalty of perjury

that: he had never persecuted (either directly or indirectly) any person because of race, religion,

national origin, membership in a particular social group or political opinion (No. 11); he never

committed a crime or offense for which he was not arrested (No.15); he never had helped anyone

enter or try to enter the United States illegally (No.22.e); and he had never lied to any U.S.

government official to gain entry or admission into the United States (No.24).

34.     On or about April 2, 2009, in furtherance of his efforts to become a United States

citizen, MRNDZIC appeared before a United States immigration officer, and again swore to the

contents of the Form N-400, including those false statements set forth in the previous paragraph.

Based in part on MRNDZIC's false statements, and his continued concealment of his role at

Čelebići, MRNDZIC's Application for Naturalization was approved on April 2, 2009.

MRNDZIC was naturalized as a United States citizen on or about April 29, 2009, and was issued

a Certificate of Naturalization (No. ** *** 781).

35.     At each stage of the refugee, lawful permanent resident, and citizenship process,

MRNDZIC failed to disclose that he was a life-long resident of Konjic rather than Nevesinje;

---

[5] Individuals are permitted to apply for United States citizenship five years after acquiring lawful permanent residency, and are required to file an Application for Naturalization (Form N-400).   On that form the applicant must certify, under penalty of perjury, that the application and information submitted with the application are true and correct.   As part of that application process, anyone applying for citizenship is interviewed by an Officer of the U.S. Citizenship and Immigration Services (formerly the Immigration and Naturalization Service) regarding their Application for Naturalization

that he was never captured, tortured, threatened or subject to forced labor by Serb forces; that he never escaped from Serb captivity; that he served as a supervisory guard at the Čelebići detention camp in 1992 during the period when atrocities were committed against Serb prisoners; that he participated in the direct and indirect persecution of Serbs at the Čelebići detention camp; and that he continued to serve in the BiH military in various other capacities, including the commander of the Musala detention center, throughout the conflict until on or about 1995.   By so doing, he foreclosed any inquiry into whether he could "return home" after the war, and any inquiry into his true military service.   It also foreclosed inquiry into whether he directly or indirectly persecuted other persons because of their religion, race, or political opinion.   Such inquiries would have elicited information which directly contradicted facts material to his eligibility for refugee status, for lawful permanent residency, and for naturalization.   His lies about his personal history, including his true home, were material, as was his concealment of his true role in the BiH military during the Bosnian War.

### Defendant's Possession and Use of Fraudulently Acquired Documents

36.     On or about March 5, 1999, shortly after his arrival in the United States, MRNDZIC applied for a Social Security card.   In support of his application for that card, MRNDZIC presented a Form I-94, which had been issued to him by the United States Immigration and Naturalization Service as a result of his approval as a refugee.   The Form I-94 which MRNDZIC used to obtain his Social Security card certified that he was authorized to work in the United States.   Absent his false statements and concealment of his true history, MRNDZIC could not have obtained either a Form I-94 authorization or a Social Security card.

37.     On or about May 7, 2009, MRNDZIC applied for an United States passport.   In support of his application and as proof of his citizenship, MRNDZIC submitted his Certificate of Naturalization, which he received less than two weeks before.   His passport application was approved on or about June 2, 2009, and a United States passport (No. ****5172) was issued to him.   Absent proof of citizenship, which MRNDZIC obtained fraudulently, a United States passport would not have been issued to him.

38.     On or about October 8, 2009, MRNDZIC applied for a replacement Social Security card.   In support of that application and as proof that he was authorized to work in the United States, MRNDZIC presented his Certificate of Naturalization.   Absent proof that he was authorized to work in the United States, a Social Security card would not have been issued to him.

39.     On or about September 12, 2017, MRNDZIC, using United States Passport No. ****5172, flew from Boston Logan International Airport to Zurich, Switzerland enroute to Eleftherios Venizelos International Airport in Athens, Greece.   On or about September 18, 2017, MRNDZIC flew from Zurich, Switzerland to Boston Logan International Airport, entering the United States at Boston, Massachusetts.   Upon entering the United States, MRNDZIC represented himself as an United States citizen, and presented to an United States border officer his United States passport (No. ****5172).   In addition, he falsely stated to the United States border officer that he came to the United States as a refugee because he was expelled from Bosnia because he is a Muslim.   He also falsely stated that he lived in Nevesinje, Bosnia.

18

40.    On or about September 26, 2019, MRNDZIC completed an on-line form with the Massachusetts of Registry of Motor Vehicles to renew his driver's license, and to obtain a "Real Credential."   To support this application, MRNDZIC was required to present certain documents to a Registry of Motor Vehicles Service Center or AAA Office.   Among the documents which could be submitted as proof of identity was a Certificate of Naturalization.

41.    On or about September 28, 2019, MRNDZIC presented his application for a new license and "Real Credential" to the Massachusetts Registry of Motor Vehicles, and attached to that application two documents which he obtained by fraud: his Certificate of Naturalization and his Social Security card.

### Defendant's Additional Lies and Concealment

42.    On or about March 22, 2022, agents from HSI, after identifying themselves, asked MRNDZIC if he would participate in a voluntary interview.   MRNDZIC agreed to do so. When shown the written statements he gave to ICTY investigators and defense counsel for Landzo in 1996, he admitted they were his statements.   He also admitted that he had been a guard at Čelebići.   When then confronted with his refugee application, he admitted that portions of his application were false.   However, when asked by HSI agents whether he had harmed anyone while a guard at Čelebići, MRNDZIC falsely claimed he never witnessed or participated in any such harm.

43.    On or about March 28, 2022, HSI agents again asked MRNDZIC if he would participate in a second voluntary interview.   He agreed.   Agents then confronted MRNDZIC with statements of survivors identifying him as participating in beatings at Čelebići.   When then

asked by HSI agents whether he had harmed anyone while a guard at Čelebići, MRNDZIC again falsely denied doing so.

44.     On May 16, 2023, agents again met with MRNDZIC at his home.   During the course of the interview, MRNDZIC again admitted to working as a guard supervisor at Čelebići and said he was ashamed of the manner in which he came to the United States.   He also identified himself in two video recordings taken at Čelebići in 1992, in which he appeared in uniform holding a rifle.   MRNDZIC also identified by name photographs of many other guards who worked at the camp in 1992.   However, he continued to deny being involved in either the direct or indirect persecution of prisoners at Čelebići.

### Conclusion

45.     On the basis of the foregoing information, there is probable cause to conclude that KEMAL MRNDZIC a/k/a Kemo did: (1) beginning on or about March 1998, and continuing through on or about May 16, 2023, knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device one or more material facts in a matter within the jurisdiction of the executive branch of the Government of the United States, in that he, as an applicant to become a refugee for admission into the United States, as an applicant for United States citizenship, and in response to questions posed to him by Special Agents from the Department of Homeland Security, concealed the fact that he participated in the direct and indirect persecution of one or more persons because of race, religion, national origin, membership in a particular social group, and political opinion, in violation of 18 U.S.C. §1001(a)(1); (2) on or about September 18, 2017, willfully and knowingly use a passport the issue of which was secured in any way by reason of

any false statement in violation of 18 U.S.C. §1542; (3) on or about September 28, 2019, use and attempt to use a certificate of naturalization, and any duplicate or copy thereof, knowing the same to have been procured by fraud, false evidence, and otherwise unlawfully obtained, in violation of 18 U.S.C. §1051(c); and (4) on or about September 28, 2019, possess and use one or more documents prescribed by statute or regulation as evidence of authorized stay and employment in the United States, to wit: an United States Department of Homeland Security Certificate of Naturalization, and a United States Social Security card, knowing them to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained, in violation of 18 U.S.C. §1546(a).

/s/ Matthew Langille
_____
MATTHEW LANGILLE
Special Agent
Homeland Security Investigations

Sworn to me through the transmission of this Affidavit by reliable electronic and telephonic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and/or 4.1, this 16th day of May, 2023

_____
HON.M. PAGE KELLEY
CHIEF UNITED STATES MAGISTRATE JUDGE