## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) ) |
| v. | ) Criminal No. 23-cr-10158-DJC ) |
| KEMAL MRNDZIC, | ) ) |
| Defendant. | ) ) ) ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                    **June 7, 2024**

## I.       Introduction

A five-count indictment charges Defendant Kemal Mrndzic ("Mrndzic") with use of a fraudulently obtained passport in violation of 18 U.S.C. § 1542 (Count I), use of a fraudulently obtained naturalization certificate in violation of 18 U.S.C. § 1015(c) (Count II), possession of fraudulently obtained authorization documents in violation of 18 U.S.C. § 1546(a) (Count III), false statement in violation of 18 U.S.C. § 1001(a)(2) (Count IV) and falsifying, concealing and covering up a material fact in violation of 18 U.S.C. § 1001(a)(1) (Count V).  Mrndzic has moved to suppress statements that he made to a U.S. Customs and Border Protection ("CBP") Officer at Boston Logan Airport on September 18, 2017 while in secondary inspection.  D. 46. Mrndzic has also moved to dismiss Counts I, II, III and V of the indictment.  D. 45.  Having considered Mrndzic's motion to dismiss, D. 45, the government's opposition to same, D. 52, Mrndzic's reply, D. 56, and the government's supplemental authority, D. 60, and oral argument,

D. 61, the Court DENIES the motion to dismiss, D. 45.  Having considered Mrndzic's motion to

suppress his September 18, 2017 statements, D. 46, the government's opposition to that motion,

D. 51, the government's supplemental opposition, D. 62, Mrndzic's supplemental filing, D. 65,

and the evidence and argument offered by the parties at the evidentiary hearing on May 22, 2024,

D. 61, the Court DENIES the motion to suppress, D. 46.  In support of these rulings, the Court

makes its findings of fact and legal analysis below.

## II.     Allegations Against Mrndzic

Unless otherwise noted, these allegations are contained in the indictment against

Mrndzic.  D. 24.

Mrndzic, and his wife, entered the United States as refugees from Bosnia in 1999.  D. 24

¶ 19.  In 1992, the Republic of Bosnia and Herzegovina ("BiH") had declared its independence

from Yugoslavia and a war ensued for the following three years.  Id. ¶ 1.  In Mrndzic's refugee

application to the United States in March 1998, he allegedly failed to disclose his wartime

activities and made several false statements including that he was from the Serb-dominated town

of Nevesinje, he was persecuted during the war as a Muslim, feared returning to Bosnia because

of that persecution and that he had a half-brother living in Massachusetts.  Id. ¶ 15.  Mrndzic

included and repeated these false statements on multiple governmental forms, and based on his

representations he was granted asylum and came to the United States as a refugee in March

1999.  Id. ¶¶ 16-19.

In April 2008, Mrndzic applied for lawful permanent residence and allegedly falsely

attested that he never knowingly committed a crime of moral turpitude for which he had not been

arrested and that he had not made a fraudulent or willful misrepresentation to procure entry into

the United States.  Id. ¶¶ 21-22.  Based on these representations, Mrndzic was granted lawful

permanent residence in October 2008.  Id. ¶ 23.  After obtaining lawful permanent residence,

Mrndzic applied for U.S. citizenship in December 2008 and became a naturalized citizen in April 2009.  Id. ¶¶ 25-26.

### 1.    Mrndzic's Use of his Fraudulently Obtained Passport (Count I)

Mrndzic had applied for a U.S. passport on May 7, 2009, and submitted the Certificate of Naturalization as proof of his citizenship.  Id. ¶ 32.  Mrndzic allegedly made false statements in the Form N-400 for his naturalization in which he attested that (1) he had never committed a crime or offense for which he was not arrested, (2) he had never helped anyone enter the United States illegally, (3) he had never lied to any U.S. government official and (4) that he had never persecuted anyone based on their race, religion, national origin, membership in a particular social group or political opinion.  Id. ¶¶ 25-27, 30.  Based on these allegedly false representations, Mrndzic's naturalization application was approved and he became a naturalized citizen on April 29, 2009 and was issued a Certificate of Naturalization.  Id. ¶ 26.  Based on his representations, his passport application was approved on June 2, 2009.  Id. ¶ 32.

On September 18, 2017, Mrndzic used his passport to travel from Boston to Greece.  Id. ¶ 33.  When he went through customs, he presented his U.S. passport and allegedly falsely stated to a CBP officer that he came to the United States as a refugee "because he was expelled from Bosnia because he is Muslim" and falsely stated that he had lived in Nevesinje, BiH.  Id. ¶ 34. This is the basis for Count I, which alleges that "[o]n or about September 18, 2017 . . . the defendant willfully and knowingly used a passport" that was secured by a false statement.  Id. ¶¶ 32, 35.

### 2.    Mrndzic's Use of Fraudulently Obtained Naturalization Certificate (Count II)

On September 28, 2019, Mrndzic renewed his driver's license and applied for a "Real Credential" at the Massachusetts RMV in Saugus.  Id. ¶ 43.  In support of that application, he

submitted his Social Security card and Certificate of Naturalization.  Id. This use of a fraudulently obtained naturalization certificate is the basis for Count II, which alleges that "[o]n or about September 28, 2019 . . . the defendant used and attempted to use a certificate of naturalization" that was fraudulently obtained when he submitted the certificate as proof of his identity to renew his Class D Passenger License and obtain a "Real Credential."  Id. ¶¶ 38-39.

3.      *Mrndzic's Possession of Fraudulently Obtained Authorization Documents (Count III)*

Count III also arises out of his September 28, 2019 renewal of his license, but charges that he also possessed his fraudulently obtained social security card in connection with that process.  Id. ¶ 43.  It further charges that he had possession of this authorization document, along with his fraudulently obtained naturalization certificate, on May 17, 2023 at his residence.  Id. ¶¶ 44-45.  Specifically, Count III alleges that "[o]n or about September 28, 2019 . . . and on or about May 17, 2023" Mrndzic possessed a United States Department of Homeland Security Certificate of Naturalization and a United States Social Security card "knowing them to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained."  Id. ¶ 45.

4.      *Mrndzic's False Statement to Federal Law Enforcement (Count IV)*

The government interviewed Mrndzic as part of its investigation on three separate occasions:  March 22 and 28, 2022 and May 16, 2023.  Id. ¶¶ 30(e), 47.  On May 16, 2023, the government alleges that Mrndzic made a false statement to a Special Agent of the Department of Homeland Security when he denied he was a prison guard at the Čelebići camp.  Id. Specifically, Count IV alleges that "[o]n or about May 16, 2023 . . . the defendant . . . knowingly and willfully made a materially false, fictitious and fraudulent statement and representation . . . when asked by a Special Agent of the Department of Homeland Security whether he had

ordered, assisted, or otherwise participated in the persecution of any person because of race, religion, or political opinion, the defendant falsely denied ever doing so." Id. ¶ 47.

      5.    *Falsifying, Concealing or Covering Up a Material Fact by Trick, Scheme or Device (Count V)*

Count V charges that "[b]eginning in or about March 1998, and continuing through on or about May 16, 2023, . . . the defendant . . . "knowingly and willfully falsify, conceal, and cover up by trick, scheme, and device one or more material facts . . . as an applicant for refuge and admission into the United States, as an applicant for United States citizenship, and in response to questions posed to him by Special Agents from the Department of Homeland Security, concealed the fact that he participated in the direct and indirect persecution of one or more persons because of race, religion, national origin, membership in a particular social group, and political opinion while he was a guard and supervisor of the Čelebići prison camp in 1992." Id. ¶ 49.

**B.**    **Factual Findings as to Mrndzic's Motion to Suppress**

Mrndzic has moved to suppress the statements that he made to a CBP officer at Logan Airport during secondary inspection on September 18, 2017, D. 46.  The Court finds the following facts based upon the evidentiary hearing held on May 22, 2024 in which the Court heard testimony from that CBP officer, Arthur Evans, and admitted two exhibits, Exh. 1 (Evans report of the September 18, 2017 secondary inspection) and Exh. 2 (the "lookout" alert for Mrndzic in the TECS system).

On September 18, 2017, Mrndzic arrived at Logan Airport from Greece.  During primary inspection, Mrndzic presented his passport.  CBP Officer Barbara Hennessey, see Exh. 1, scanned the passport and received a "lookout" alert in the Treasury Enforcement Communications System ("TECS") regarding Mrndzic indicating that he may not be admissible

under Section 212(a)(3)(E) of the Immigration and Nationality Act.  Exh. 2; D. 46-1.[1]  It is mandatory for a CBP officer to refer a passenger for secondary inspection if there is a lookout in the system when he comes through primary inspection.  Evans explained that a lookout is an alert that can be entered by CBP, Homeland Security, the Department of State or other agencies. CBP Officer Hennessey made the referral of Mrndzic to secondary inspection at 8:23 p.m.  Id. Another CBP officer escorted Mrndzic to the designated, secondary inspection area in the baggage hall for this purpose.

Evans, a CBP officer assigned to the Tactical Terrorism Response Team ("TTRT"), was assigned to conduct the secondary inspection of Mrndzic.  During a secondary inspection, a CBP officer asks a passenger for a more detailed explanation of their travels (i.e., "who, what, when, why and where" questions and any follow-up questions that arise from the conversation).   He explained that the "baggage, secondary" area is a "controlled area" that is part of the baggage hall, but is separated by a glass partition.  Once a passenger is escorted there, the secondary inspection is assigned to a CBP officer.  The passenger is instructed to get his luggage from the baggage carousel and then wait in the "baggage, secondary" area for the secondary inspection. A CBP officer will not begin a secondary inspection until a passenger has retrieved his luggage, which may take some time as passengers await an airline's return of their checked luggage.

Evans conducted Mrndzic's secondary inspection.  Although he could not specifically recall if he reviewed the lookout before beginning his interview with Mrndzic, it is his customary practice to do so.  Mrndzic was waiting in the "baggage, secondary" area with both his luggage

---

[1] Although the lookout admitted as Exh. 2, D. 46-1, was updated as of January 28, 2022 and Evans was not sure that it was in the same substance that he saw it on September 18, 2017, it is a reasonable inference from the nature of the questions that Evans asked and responses that Mrndzic gave in secondary inspection that the subject of the lookout was about his admissibility, connection to Bosnia and that the Human Rights Unit of ICE should be contacted if CBP encountered him.  Compare Exh. 2, D. 46-1 with Exh. 1, D. 46-2.

and his cell phone.   Evans began the secondary inspection at approximately 9:17 p.m.   He identified himself as a CBP officer to Mrndzic and he was wearing the indicia of his office (i.e., firearm, handcuffs, baton).   During the inspection, Evans stood across a table from Mrndzic in the inspection area, which was not a private, interview room.   Evans noted that there were about six to ten other passengers in the area during this inspection.   He inspected Mrndzic's luggage with "negative" results, finding that he was carrying souvenirs and clothing.  See Exh. 1.   Evans asked him a series of who/what/when/why/where questions as is his standard practice.   In response, Mrndzic said that he was returning from a business trip to Greece for his company, "Big Y," that he first entered the United States in 1999, that he had been expelled from Bosnia because he was Muslim, that he had lived in Nevesinje, Bosnia and had worked in construction there.   Exh. 1; Exh. 46-2.   He said that he had last visited Bosnia in 2011.  Id.   The secondary inspection ended at approximately 9:25 p.m. and Mrndzic was permitted to leave and enter the United States.   After the inspection, Evans contacted Amy Nunez of the ICE Human Rights Unit as the lookout requested.   Exh. 2; Exh. 46-1.   He had no contact with her (or anyone in Homeland Security) before or during the secondary inspection or Mrndzic.

## III.    Procedural History

On June 14, 2023, a grand jury indicted Mrndzic on Counts I through V.  D. 24.  Mrndzic has moved to dismiss Counts I, II, III and V of the indictment.  D. 45.  Mrndzic has also moved to suppress the statements that he made to  CBP Officer Evans on September 18, 2017.  D. 46. The Court held an evidentiary hearing regarding the motion to suppress on May 22, 2024, heard argument on both motions and took the matters under advisement, D. 61.

**IV.     Motion to Dismiss**

Mrndzic moves to dismiss four of the five charges against him in the indictment.  See D. 45.  Mrndzic contends that Counts I, II, III and V, charged in the June 14, 2023 indictment, D. 24, should be dismissed because they are time barred.  D. 45 at 1.  He also argues that Counts I and III should be dismissed for failure to state an offense.  Id.

**A.     Dismissal of Counts I-III and V on Statute of Limitations Grounds is Not Warranted**

*1.     Counts I, II and III*

Although Mrndzic concedes that he allegedly used his fraudulently passport (Count I) and his fraudulently obtained naturalization certification (Counts III), and possessed his fraudulently obtained authorization documents (Count III) on various dates between 2017 and 2023, which falls within the applicable statute of limitations, he contends that the "gravamen of the criminal conduct" and false statements in Mrndzic's applications for refugee status, legal permanent residence and naturalization took place between 1998 and 2008 and, therefore, fall outside of the statute of limitations.  D. 45 at 17.  The Court disagrees.

Charges for Counts II and III (18 U.S.C. § 1015(c) and § 1546(a)) are subject to a five-year statute of limitations.  18 U.S.C. § 3282.  Count I, charging a violation of 18 U.S.C. § 1542, has a ten-year statute of limitations.  18 U.S.C. § 3291.  It is well settled that the statute of limitations begins to run when each element of the crime has occurred and the crime is complete.  See Toussie v. United States, 397 U.S. 112, 115 (1970).  Here, Counts I and II are crimes of illegal *use* of a passport and naturalization certificate, respectively, and, similarly, Count III charges illegal *possession* of the social security card and naturalization certificate.  The crime is complete as to all of the requisite elements of each crime, not the false statements that underly same.

Count I brought under 18 U.S.C. § 1542 makes it a crime for a person to "willfully and knowingly use[ ] or attempt[ ] to use, or furnish[ ] to another for use any passport the issue of which was secured in any way by reason of any false statement."  18 U.S.C. § 1542.  Contrary to Mrndzic's argument that Count I is time-barred because the gravamen of the false statements occurred outside the statute of limitations, as "use" is a principal element of the crime, the statute of limitations does not begin to run until Mrndzic uses the alleged fraudulently obtained passport.  See Toussie, 397 U.S. at 115; United States v. George, 386 F.3d 383, 389 (2d Cir. 2004) (noting that the crime of "use" under "§ 1542 is complete once a passport that is obtained by a false statement is subsequently used" intentionally).  Here, the indictment states that Mrndzic used the alleged fraudulently obtained passport on September 18, 2017, which is within the ten-year statute of limitations.  See D. 24 ¶ 35.

Mrndzic's arguments that Count II is time-barred is similarly without merit.  Count II brought under 18 U.S.C. § 1015(c) makes it a crime for "[w]hoever uses or attempts to use any . . . certificate of naturalization . . . , knowing the same to have been procured by fraud or false evidence."  18 U.S.C. § 1015(c).  Here, the indictment charges that Mrndzic used a fraudulently obtained naturalization certificate on September 28, 2019, which is within the five-year statute of limitations.  See D. 24 ¶¶ 37-39.

Count III brought under 18 U.S.C. § 1546(a) makes it a crime for a person to "knowingly . . . possess[ ] . . . any. . . visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained."  18 U.S.C. § 1546(a).  Count III is a

9

"*possessory* offense, not a *false statement* offense."  United States v. Krstic, 558 F.3d 1010, 1017 (9th Cir. 2009) (emphasis in original).  "Unlike false statement crimes, possessory offenses have long been described as 'continuing offenses' that are not complete upon receipt of the prohibited item," but rather "the statute of limitations does not begin to run until the possessor parts with the item."  Id.  Here, Mrndzic is charged with possessing a fraudulently obtained certificate of naturalization and Social Security card, on September 28, 2019 and May 17, 2023, which is well within the five-year statute of limitations.  D. 24 ¶ 45; United States v. Jakisa, No. 14-cr-119-SRN/SER, 2015 WL 520618, at *2, 5 (D. Minn. Feb. 9, 2015) (holding that charge pursuant to § 1546(a) for possession of a green card that was procured by false statements was not time barred because "the statute of limitations for this offense begins when the possession ends").  Accordingly, Counts I, II and III are not time-barred and the Court denies the motion to dismiss on this basis.

### 2.    Count V

Mrndzic argues that any acts alleged under Count V that occurred prior to June 2018 are time-barred.  D. 45 at 18.  Section 1001(a)(1) makes it a crime for a person who, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States, knowingly and willfully . . . falsifies, conceals, or covers up by any trick, scheme, or device a material fact."  18 U.S.C. § 1001(a)(1).  At least one session of this Court has concluded that under § 1001(a)(1),  the crime "is not a 'continuing offense' for statute of limitations purposes" and the "crime is 'committed,' within the meaning of 18 U.S.C. § 3282(a), when the defendant commits an affirmative act of concealment in furtherance of the scheme. Each new affirmative act of concealment is a new criminal act, triggering a new limitations

period."  See e.g., United States v. Mubayyid, 567 F. Supp. 2d 223, 241-42 (D. Mass. 2008), aff'd in part, rev'd in part, 658 F.3d 35 (1st Cir. 2011).[2]

Here, the indictment alleges that between 1998 and May 2023 Mrndzic engaged in a scheme to conceal material facts as an applicant for refuge and admission into the United States, as an application for citizenship and in response to questions posed to him by Special Agents from the Department of Homeland Security.  D. 24 ¶ 49.  In 1998, Mrndzic signed a Sworn Statement of Refugee Applying for Entry into the United States (Form G-646) in which he concealed his involvement in the Čelebići camp.  Id. ¶ 30.  Mrndzic also concealed his involvement in the Čelebići camp in 2008 on a sworn Form I-485 in which he falsely stated that he had not knowingly committed a crime of moral turpitude and in April 2009 on Form N-400. Id.  These affirmative acts occurred between fourteen and twenty-five years prior to the indictment.  The indictment, however, also alleges that Mrndzic concealed his involvement in the persecution of Serbs by serving as a prison guard at Čelebići in interviews with Special Agents from Homeland Security on or about March 22 and 28, 2022 and May 16, 2023, each of these acts are within the five-year statute of limitations.  D. 24 ¶ 30.  Accordingly, Mrndzic has committed affirmative acts of concealment within the limitations period and Count V is not barred by the statute of limitations.  See Mubayyid, 567 F. Supp. 2d at 242-46.

---

[2] The Court recognizes that other courts have held that "§ 1001 is a continuing offense for purposes of the statute of limitations."  United States v. Saffarinia, 424 F. Supp. 3d 46, 59 (D.D.C. 2020) (citing Bramblett v. United States, 231 F.2d 489, 490-91 (D.C. Cir. 1956)).  These courts have also held that the prosecution for a scheme to conceal that begins outside the statute of limitations period is not time-barred if the defendant commits an affirmative act of concealment in furtherance of the scheme within the limitations period.  See United States v. Menendez, 137 F. Supp. 3d 688, 699 (D.N.J. 2015), aff'd, 831 F.3d 155 (3d Cir. 2016) (concluding in part that the reasoning in Bramblett is persuasive and holding that, because the last two affirmative acts of the scheme occurred within the limitations period, all of the actions constituting the scheme are timely).

**B.**     **Dismissal of Counts I and III for Failure to State an Offense is Not**
             **Warranted**

A defendant challenging the sufficiency of an indictment shoulder a heavy burden.

United States v. McPhail, No. 14-10201-DJC, 2015 WL 2226249, at *2 (D. Mass. May 12,

2015).  This is because the Court "should exercise its authority to dismiss cautiously, since to

dismiss an indictment 'directly encroaches upon the fundamental role of the grand jury.'"

United States v. Thomas, 519 F. Supp. 2d 141, 143–44 (D. Me. 2007) (quoting Whitehouse v.

U.S. Dist. Ct., 53 F.3d 1349, 1360 (1st Cir. 1995)).  "The inquiry at this stage is not whether the

government has sufficient evidence to prove the crime, but whether the allegations in the

indictment are sufficient on their face."  United States v. Thompson, 207 F. Supp. 3d 106, 109

(D. Mass. 2016).  An indictment need only "apprise the defendant of the charged offense," not

force "the government [to] present[] enough evidence to support the charge."  United States v.

Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (internal citation and quotation marks omitted).

"Viewed in its entirety, an indictment is sufficient if it describes all of the elements of the

charged offense using the words of the relevant criminal statute."  United States v. Wells, 766

F.2d 12, 22 (1st Cir. 1985) (citing cases).

*1.     Count I*

Mrndzic argues that Count I of the indictment should be dismissed because the

indictment fails to allege a false statement in a passport application, which Mrndzic contends is

required to state an offense.  D. 45 at 12.  Again, Count I charges Mrndzic with use of a

fraudulently obtained passport in violation of 18 U.S.C § 1542 based on his use of same on

September 18, 2017 when he presented it at Logan Airport to re-enter the United States.  D. 24

¶¶ 32-35.  Section 1542 applies to:

> [w]hoever willfully and knowingly makes any false statement in an application for passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another, contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws; or
>
> [w]hoever willfully and knowingly uses or attempts to use, or furnishes to another for use any passport the issue of which was secured in any way by reason of any false statement.

18 U.S.C § 1542.  Section 1542 applies to two separate and distinct crimes:  one of "securing" a passport by false statements alleged in the passport application and one of "using" a passport secured in any way by a false statement.  See United States v. Caceres-Prado, 601 F. Supp. 468, 470-71 (D.P.R. 1984) (reasoning that § 1542 contains two separate and distinct crimes because "[t]his [s]ection contains two paragraphs, separated by the conjunction 'or'").  Mrndzic is charged with the latter, "use" crime.

Mrndzic relies upon United States v. McFarlane, 548 F. Supp. 3d 535, 542 (E.D.N.C. 2021) to argue that a false statement in the passport application is required to prove a violation of the "use" prong under § 1542.  Id.; see D. 45 at 13-16.  In McFarlane, the defendant was charged with a violation of using his 2009 passport in 2018 and 2019 to obtain his 2019 passport by false statement.  Id. at 541-42.  The indictment alleged that McFarlane had secured his 2009 passport using false statements because he submitted his 1999 passport as part of the 2009 application which had been secured by submitting his 1999 naturalization certificate and the naturalization certificate had been secured by his false statements in 1998 and 1999.  Id. at 542.  McFarlane subsequently submitted his 2009 passport when he renewed his passport again in 2019.  Id. at 540.  The Court held that the indictment did not allege a prosecutable offense because McFarlane had not used false statements to secure his 2019 passport because (1) the 1999 and 2009 passports were not false documents, (2) the only false statements cited in the indictment are the

1998 and 1999 false statements that he made during his naturalization proceedings and (3) McFarlane did not make these statements to secure his 2009 or 2019 passport.  Id. at 542.

The government contends that McFarlane was wrongly decided because the Court did not consider the difference in the statutory language between the two paragraphs of § 1542 which charge for violations of different crimes.  D. 52 at 9-10.   The government contends that the phrases "in any way by reason of any false statement" broadens the crime under the "use" paragraph of the statute and does not confine the false statement to the application for the passport.  Id. at 10.  Mrndzic argues that McFarlane as well as jury instructions which state that the government must establish that the false statement must have been made in the application in the issuance of the passport limits the false statement to the passport application.  See D. 45 at 13-14 (citing 2 Modern Federal Jury Instructions-Criminal ¶ 47.04 (2023)).

Although the First Circuit has not addressed this issue yet, the Court is not persuaded by McFarlane for the reasons articulated by the government and finds the reasoning of another Circuit that has addressed the distinct crimes under § 1542 persuasive.  The Second Circuit in analyzing the differences between the two paragraphs indicated that "there are significant textual differences between the 'securing' and 'use' prongs with respect to their treatment of who must make the false statement."  United States v. Mends, 412 F. App'x 370, 373 (2d Cir. 2011).  The court reasoned that "[w]hereas the former prong makes clear that the person charged with the 'securing' offense must make the false statement, the latter is phrased expansively and in the passive voice ('was secured in any way by reason of any false statement'), thus suggesting that Congress did not intend for any such limitation on who must make the statement to apply to the 'use' prong."  Id.

14

The Court is not persuaded that the language in the second paragraph that a passport "was secured in any way by reason of any false statement" is explicitly confined to statements in the passport application as the language under the "use" prong does not limit the phrase "false statements" to a passport application like in the "securing" paragraph.  See 18 U.S.C. § 1542. Mrndzic argues that the language the "issue of which was secured" mirrors the language in the first paragraph of "any false statement in an application for passport with intent to induce or secure the issuance of a passport" and therefore compels the result that the false statement must be confined to a passport application.  See D. 56 at 2.  The Court disagrees.  Mrndzic overlooks the two uses of the word "any" in the "use" paragraph which serves to broaden the conduct under this second paragraph.  See United States v. Ven-Fuel, Inc., 758 F.2d 741, 749 (1st Cir. 1985) (interpreting the phrase "any false statement" and reasoning that the "generality of this language plainly indicates that any false statement or practice, not just a particular genre of entry document, is within the statutory sweep"); Mends, 412 F. App'x at 373 (reasoning that the second paragraph's language is broader than the first paragraph).  If the Court were to read the statute to apply only to statements made in passport applications it would render the phrase "secured in any way" superfluous.[3]  Ven-Fuel, Inc., 758 F.2d at 751–52 (reasoning that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless,

---

[3] Mrndzic asserts that the rule of lenity requires resolving any ambiguity as to the meaning of "use " in his favor. D. 56 at 2-3.  "The rule of lenity provides that in a criminal case, a court must resolve statutory ambiguity in favor of the accused . . . [b]ut the sine qua non for the rule's application is genuine ambiguity, and a statute is not ambiguous simply because litigants (or even an occasional court) question its interpretation."  United States v. Dwinells, 508 F.3d 63, 69–70 (1st Cir. 2007) (citations omitted).  Given the analysis above, the Court concludes there is no genuine ambiguity in the statutory language at issue here that warrants the rule of lenity.

redundant or superfluous").[4]   Accordingly, the Court denies Mrndzic's motion to dismiss Count

I.

           *2.*       *Count III*

---

[4] Also, to the extent that Mrndzic was relying upon ¶ 47.04 of the Modern Federal Jury Instructions to the extent that they suggest that the government must prove the defendant made a false statement in the passport application, D. 45 at 13-14, such a treatise "does not have the status of controlling law" and "the instruction at issue provides no explanation for why it reads the 'use' prong in this way," as the Second Circuit in Mends recognized.  Mends, 412 F. App'x at 373 n.4.

Mrndzic argues that Count III brought under 18 U.S.C. § 1546(a) should fail because the indictment does not state any false statements or fraud in Mrndzic's original application for a Social Security number in 1999 or application for replacement Social Security card in 2009. D. 45 at 16-17. Count III is predicated on Mrndzic possessing two "authorization documents" (a Social Security card and Certificate of Naturalization) which were procured by fraudulent statements when he renewed his license on September 28, 2019 (as to the Social Security card) and on May 17, 2023 (when he possessed both). D. 24 ¶¶ 41-45. The indictment alleges that in 1999 when Mrndzic applied for his Social Security number he submitted the fraudulently obtained I-94 form which was issued to him in connection with his approval and entry as a refugee. Id. ¶ 41. The indictment also alleges that in October 2009 when Mrndzic applied for a replacement Social Security card, he submitted his Certificate of Naturalization which he fraudulently obtained. See id. ¶ 42.

The language of the statute makes it a crime for:

"[w]hoever knowingly… utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained."

18 U.S.C. § 1546. To prove an offense, the government would need to "prove beyond a reasonable doubt that (1) [Mrndzic] knowingly [possessed] documents prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, and (2) [Mrndzic] knew the documents had been forged, counterfeited, falsely made, or unlawfully obtained." United States v. Machorro-Xochicale, 840 F.3d 545, 548 (8th Cir. 2016). Courts interpreting § 1546(a) have held that the statute applies to document which are otherwise authentic documents but have been secured by fraud. See United States v. Kouevi, 698 F.3d

126, 139 (3d Cir. 2012) (reasoning that the "plain language of the statute reveals that the first paragraph of § 1546(a) must be read to prohibit the possession or use of authentic immigration documents which are obtained by fraud"); <u>Krstic</u>, 558 F.3d at 1017 (reasoning that § 1546 applies to "possessing an otherwise authentic document that one knows has been procured by means of a false claim or statement").

Here, the Court concludes that the indictment sufficiently alleges that Mrndzic possessed a Social Security card and Certificate of Naturalization that was procured by fraud. The indictment states that in connection with his original Social Security card application in 1999, Mrndzic submitted an I-94 form, which was issued to him in 1999 after he entered the United States. D. 24 ¶¶ 19, 41. The indictment alleges that Mrndzic obtained the I-94 form fraudulently in the same manner that he obtained entry as a refugee, <u>id.</u> ¶ 41. The indictment also states that Mrndzic secured the renewal of his Social Security card by submitting his Certificate of Naturalization. <u>Id.</u> ¶ 42. If the government can prove these allegations at trial, the Certificate of Naturalization and Social Security card, although "authentic" documents were tainted by Mrndzic's knowledge that both were obtained by false claims or statements. <u>See</u> <u>Jakisa</u>, 2015 WL 520618, at *5 (reasoning that because a permanent resident card was obtained through false statements that it was tainted because it was procured through improper means); <u>United States v. Mohamed</u>, 457 F. App'x 635, 636–37 (9th Cir. 2011) (unpublished) (reasoning that there was ample evidence to sustain defendant's conviction of § 1546(a) relating to possession of an unlawful permanent resident cards that had been procured by means of a false statement because "the government offered evidence of numerous repeated false statements [defendant] submitted to United States immigration authorities in his effort to obtain asylum and later permanent residenc[y]").

Mrndzic relies upon <u>McFarlane</u> again as to this charge, arguing that there were no false statements in his application for his Social Security card to state a prosecutable offense.  D. 45 at 16-17.  In <u>McFarlane</u>, the defendant also was charged for violating § 1546(a) by possessing his 2009 passport which was obtained by fraud because the defendant submitted his Certificate of Naturalization with the passport application and had fraudulently obtained his Certificate of Naturalization based on false statements he made in 1998 and 1999.  <u>McFarlane</u>, 548 F. Supp. 3d at 543.  The defendant was also charged with possessing his 2019 passport which was procured by using his 2009 passport that was based on the Certificate of Naturalization.  <u>Id.</u>  The Court disagreed with the government's theory about the reach of § 1546(a) and dismissed the charges because "the indictment does not allege any false statement or fraud in McFarlane's applications for his 2009 or 2019 passports."  <u>Id.</u> at 544.  Central to McFarlane's reasoning was that the false statements were not made in the application for the charged document.  <u>Id.</u>  But this reading of the first paragraph of § 1546(a), like that of the court in <u>McFarlane</u>, seems to confuse a charge for false statements "with respect to a material fact in any application" for passport with a charge for possession of a fraudulently obtained authorization document under the first paragraph which is at issue here.  <u>See</u> <u>id.</u> at 543; <u>see also</u> <u>United States v. Cvijanovic</u>, No. 10-cr-280, 2011 WL 1498599, at *2 (E.D. Wis. Feb. 8, 2011), <u>report and recommendation adopted</u>, No. 10-cr-280, 2011 WL 1498595 (E.D. Wis. Apr. 19, 2011) (noting that the defendant is charged with violating the first paragraph of § 1546(a) for possession and not the fourth paragraph which criminalizes false statements).  The Court is not persuaded that the first paragraph of § 1546(a) compels such a narrow reading of the statute as adopted in <u>McFarlane</u>, particularly because the language "procured by means of any false claim or statement, or to have been otherwise procured by fraud" is significantly broader than the fourth paragraph which expressly applies to a false

statement in an application document.  See 18 U.S.C. § 1546(a) (criminalizing in paragraph four "any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder").  For all these reasons, dismissal of Count III is not warranted.

## V.    Motion to Suppress

### A.    The Court Denies Suppression of Mrndzic's Statements During His Secondary Inspection at Logan Airport

Mrndzic seeks to suppress his statements to Officer Evans on the grounds that the agent failed to give him Miranda warnings prior to asking him questions during the secondary inspection. D. 46 at 6.  It is well settled that prior to a custodial interrogation, police must inform a person of his Miranda rights.  Miranda v. Arizona, 384 U.S. 436, 479 (1966); United States v. Guerrier, 669 F.3d 1, 5 (1st Cir. 2011).  "Both 'custody' and 'interrogation' must be present to require Miranda warnings."  United States v. Molina-Gomez, 781 F.3d 13, 22 (1st Cir. 2015). "Determinations about Miranda custody begin by examining all of the 'circumstances surrounding the interrogation' and asking whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  United States v. Ellison, 632 F.3d 727, 729 (1st Cir.2010) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  In making such determination, it is the objective circumstances of the questioning, not the subjective views of the parties involved that is relevant.  Ellison, 632 F.3d at 729.  All of this analysis, however, concerns the paradigm of interrogation in the Miranda, "the paradigm example of interrogating a suspect at a police station."  Id.  But when confronted with a case, like this one, "outside of the Miranda paradigm," "custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda."  Id.

"In the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders." United States v. Fernandez–Ventura, 132 F.3d 844, 846 (1st Cir. 1998) ("Ventura II") "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points.  This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for Miranda warnings." Id. at 846–47 (quoting United States v. Fernandez–Ventura, 85 F.3d 708, 711 (1st Cir. 1996) ("Ventura I").

Here, the hallmarks of the questioning of Mrndzic were part of a routine inspection at a U.S. entry point designed to determine his admissibility and was not a custodial interrogation for Miranda purposes.  First, a review of the totality of circumstances indicates that Mrndzic was not in custody during the secondary inspection.  Although Mrndzic contends that he did not feel free to leave, D. 46 at 2, the First Circuit has made clear that a Court "could not infer that travelers were in custody because they were not free simply to walk away from Customs inspectors." Ventura II, 132 F.3d at 847.  In determining custody, relevant considerations include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Ventura I, 85 F.3d at 711 (internal citation and quotation marks omitted).  Mrndzic was placed in a large waiting room off the main baggage area for, at most, approximately fifty-four minutes, he was questioned by a single CBP officer for approximately eight minutes in a partitioned area of the baggage area (as opposed to an enclosed interview room) and there is no suggestion in the record that he was in any way physically restrained.  See D. 46 at 4-5; D. 51 at 3.  These facts do not support the conclusion

that Mrndzic was in custody.  See Ventura II, 132 F.3d at 847 (reasoning that "[t]he presence of the three [officers] is not so unusual as to convert a Customs inspection into an arrest," the "presence of armed officers in this case was simply a part of the Customs routine" and waiting an hour and twenty minutes, some of which included questioning, was not extraordinary); United States v. Pratt, 645 F.2d 89, 90 (1st Cir. 1981) (concluding defendant was not in custody when he was taken by two agents to a windowless seven by five foot room for secondary inspection adjacent to the main customs area and the inspection lasted for approximately fifteen minutes).

Second, the questions that Officer Evans posed to Mrndzic during the secondary inspection do not rise to the level of an interrogation as he contends. See D. 46 at 5-6.[5]  "If the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution" then it could be a basis to find that the questioning has become an interrogation.  United States v. Kiam, 432 F.3d 524, 530 (3d Cir. 2006).  "As a result, a "careful examination of all the circumstances is needed in order to

---

[5] Mrndzic further argues that the statute cited in the lookout which flagged Mrndzic for secondary inspection is inapplicable to him because 212(A)(3)(E) applies to the inadmissibility of aliens, and Mrndzic is a naturalized citizen.  See D. 46 at 2 n.2, 8 U.S.C. § 1182(a)(3)(E)(ii) (providing factors that would make an alien inadmissible to receive visas and be ineligible to be admitted into the United States, including those aliens who have "ordered, incited, assisted, or otherwise participated in genocide").  As requested by the Court at the hearing, D. 61, the government submitted supplemental briefing on the potential for de-naturalization and the government contends that pursuant to 8 U.S.C. § 1451, persons who have been granted citizenship based upon false statements and omissions about the persecution of another person can be denaturalized.  See 62 at 2; 8 U.S.C. § 1451(providing that whoever knowingly procures naturalization based upon false statements by the concealment of a material fact or by willful representation is subject to revocation of naturalization).  Mrndzic argues in response that whether Mrndzic could be de-naturalized is irrelevant for the purposes of Miranda as the government did not institute those proceedings.  D. 65 at 2.  This rebuttal misses the point.  That Officer Evan's questioning about Mrndzic relates to the lookout flagging possible grounds for de-naturalization (even as his responses form, in part, the basis for the criminal charges against him) provides further support for the conclusion that the secondary inspection questioning did not constitute custodial interrogation.  See Kiam, 432 F.3d at 531.

distinguish between "routine Customs questioning and custodial interrogation." Molina-Gomez, 781 F.3d at 23 (internal citation and quotation marks omitted).

Here, Officer Evans posed routine questions relating to Mrndzic's admissibility such as his where he traveled to, where he lived and how he came to the United States. See D. 46 at 2; 46-2. Although some of Mrndzic's answers to these questions could also relate to criminal acts (i.e., falsely stating claiming that he was "expelled from Bosnia because he is Muslim" and that he lived in Nevesinje prior to leaving Bosnia when he was a resident of Konjic, D. 51 at 3 n.3), the questions also related to his admissibility. See United States v. Feliz, No. 13-cr-10171-DJC, 2014 WL 47778, at *3 (D. Mass. Jan. 6, 2014) (reasoning that questions posed during secondary inspection concerned admissibility even though some of defendant's answers also related to his criminal activity). Courts have recognized that "the mere overlap of the admissibility questioning with the elements of [the defendant's] criminal liability is not fatal" and does not automatically turn routine questions during a secondary inspection into an interrogation. See e.g., Kiam, 432 F.3d at 530 n.6 (reasoning that questioning during a secondary inspection of defendant about the same conduct that "overlap[ped]" between his admissibility and the basis for criminal charge did not constitute an interrogation).

Molina-Gomez, 781 F.3d at 24, does not compel a different result. In Molina-Gomez, the defendant sought to suppress statements he made during a secondary inspection to CPB officers as he returned to Puerto Rico from traveling to Columbia. Id. at 16. Molina-Gomez was flagged for questioning because he had taken a short trip to Columbia which was an area known for illegal narcotics. Id. Upon deplaning, he was taken to a secondary inspection where he was escorted to a  small, windowless room containing one desk, where he held for approximately two hours. Id. During questioning from CPB officers, Molina-Gomez's answers to questions raised

suspicions of illegal activity and officers suspected the defendant of smuggling narcotics.  Id. at 16-17.  In addition to finding that Molina was in custody during the secondary inspection, the First Circuit held that Molina's questioning turned into an interrogation when it went beyond "routine" questioning when officers asked questions that specifically "prob[ed] their suspicions of Molina's involvement with drug smuggling activity."  Id. at 23.   The First Circuit noted that because the officers were "already leery that Molina may have been involved in drug trafficking," the questioning concerning Molina's involvement with drug activity was "clearly aimed at eliciting an incriminating response."  Id. at 24.  By contrast, even though the questions Office Evans posed to Mrndzic elicited incriminating statements concerning past criminal activity, there was nothing to "distinguish this case from a routine Customs inspection so as to support the . . . conclusion that [the defendants were] in custody." Ventura II, 132 F.3d at 848. Since there was no custodial interrogation, Miranda warnings were not required.

For all of the aforementioned reasons, the Court denies Mrndzic's motion to suppress his September 18, 2017 statements to Officer Evans.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Mrndzic's motion to dismiss, D. 45, and DENIES Mrndzic's motion to suppress, D. 46.

**So Ordered.**

/s Denise J. Casper
United States District Judge