# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  1:23-cr-10158-DJC |
| | ) | |
| KEMAL MRNDZIC | ) | |
| a/k/a "KEMO" | ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States files this brief to address issues which it anticipates may arise during the trial of this matter.

## I.    THE CHARGES

The defendant is charged in a seven count Superseding Indictment returned by the grand jury on July 9, 2024. [D.70].  As outlined in that speaking indictment, the charges arise from two interrelated criminal schemes.  The defendant's first criminal scheme was to fabricate a personal history of persecution by Serbs, his internal displacement, and his flight as a refugee to an island in Croatia with his purported wife, all with an eye towards seeking and obtaining entry into the United States as a refugee fleeing persecution.  The defendant engaged in that scheme with his then-girlfriend (and future wife), Sejla Velagic, and with a colleague from Konjic, Azem Zebic.  Zebic had successfully used a nearly identical scheme the year before to fraudulently gain entry into the United States as a refugee.[1]  The defendant's scheme included a wide range of related false and fraudulent statements designed to convince U.S. immigration officials that he met the criteria for refugee status, including that: he was a Muslim born and raised in a Serb-dominated

---

[1] Mr. Zebic is separately charged, has pleaded guilty, and is awaiting sentencing.  *See United States v. Azem Zebic*, 23-10139-DJC.  Mr. Zebic will testify in this matter.

town (Nevesinje); was detained, beaten, threatened, and forced into hard labor by Serb forces in Nevesinje in June 1992; he escaped from Serb forces in August 1992 and fled to a refugee camp in Jablanica (near Konjic, in a Muslim-controlled area) where he met and married his purported wife; he served for a single year in the Bosnian Army as an anti-aircraft spotter and deserted in 1994 when he fled to Croatia with is purported wife; and he had a half-brother (Azem Zebic) living in Massachusetts who would sponsor him.  He used this fabricated personal history to be approved as a refugee to the United States in November 1998 and to enter the country in March 1999, with his wife of just a few weeks.[2]  His wife was admitted to the United States as a derivative refugee based entirely on the defendant's false claims of persecution.

Upon entry, the defendant and his wife were granted permission to work, applied for and obtained Social Security cards in Boston, and began living in Lynn, Massachusetts.  The defendant later successfully applied for lawful permanent residence status, citizenship, a United States passport, and a Massachusetts "Real Credential" (also known as a "Real ID").  While each of these subsequent benefits was only possible because of the defendant's initial lies about being a persecuted Bosniak Muslim, the defendant also continued to fabricate information to gain these benefits.  The defendant traveled overseas on his fraudulently acquired passport in 2017 (the subject of Count One), used his fraudulently obtained Naturalization Certificate and Social Security card to obtain a Massachusetts Real ID in 2019 (the subject of Count Two), and possessed these fraudulently obtained documents at the time of his Real ID application and on the date of his arrest in 2023 (the subject of Count Three).

---

[2] The couple was married in Konjic in February 1999, a few weeks before they departed for the U.S.

The defendant's second, interrelated criminal scheme was to conceal the fact that he was a persecutor rather than the victim of persecution during the Bosnian War. Beginning as early as 1996 when he provided false information to ICTY investigators and up to his final interview with HSI agents in May 2023, the defendant concealed his involvement in the persecution of Serbs at the notorious Celebici camp in 1992. It is this second scheme – the concealment of conduct which would absolutely bar him from becoming a refugee in the United States -- which fundamentally distinguishes his conduct from the conduct of Azem Zebic and from that of his onetime girlfriend and now wife. Survivors of the Celebici camp will testify that the defendant beat them, threatened them, and held them in degrading and deplorable conditions. They will also testify that the Celebici detainees were nearly exclusively Serbs, and guards, including the defendant, routinely used ethnically charged anti-Serb threats and statements in connection with the beating and starvation of the detainees.

While the defendant has claimed as recently as May 2023, that he saw nothing, heard nothing, and knew almost nothing about the abuses being committed at Celebici, survivors will testify that the persecution of prisoners occurred nearly every day and every night, was open and notorious, and the screams and cries from detainees being tortured and beaten could readily be heard inside and outside the detention units. Nothing about the persecution committed at Celebici was concealed by the guards because it was meant to intimidate the hundreds of Serb detainees being held captive by a small and relatively inexperienced guard force. The evidence will demonstrate, therefore, that it was impossible for a guard working at the camp not to be aware of it. Moreover, survivors will testify that Mrndzic actively participated in beating and threatening prisoners, and that he routinely worked shifts with, and was seen with, Hazim Delic, the deputy commander of the camp, and one of the chief persecutors.

**Count I: Use of a Fraudulently Obtained Passport**

Count One of the Superseding Indictment charges the defendant with the use of a fraudulently obtained passport on September 18, 2017, in violation of 18 U.S.C. § 1542.[3]  The elements of that offense are:

First, that on or about September 18, 2017, the defendant used a United States Passport;

Second, that the passport was secured in any way by reason of any false statement; and

Third, the defendant acted knowingly and willfully.

**Count II: Use of a Fraudulently Obtained Naturalization Certificate**

 Count Two of the Superseding Indictment charges the defendant with the use and attempted use of a certificate of naturalization on or about September 28, 2019, in violation of 18 U.S.C. § 1015(c).[4]  It is alleged that the defendant used a fraudulently obtained naturalization certificate to obtain a "Real Credential" from the Massachusetts Registry of Motor Vehicles on or about September 28, 2019.  The elements of the offense are:

First, that on or about September 28, 2019, the defendant used a United States Department of Homeland Security certificate of naturalization, or any duplicate or copy thereof;

---

[3] That statute reads in pertinent part: "Whoever willfully and knowingly uses or attempts to use . . . any passport the issue of which was secured in any way by reason of any false statement— Shall be fined under this title, imprisoned not more than . . . 10 years. . ., or both."

[4] That statute reads in pertinent part: "Whoever uses or attempts to use any . . . certificate of naturalization, certificate of citizenship or other documentary evidence of naturalization or of citizenship, or any duplicate or copy thereof, knowing the same to have been procured by fraud or false evidence . . . Shall be fined under this title or imprisoned not more than five years, or both."

<u>Second</u>, the defendant knew the certificate of naturalization (or copy) was procured by fraud, or by false evidence, or otherwise unlawfully obtained.

## Count III: Possession of Fraudulently Obtained Social Security Card and Naturalization Certificate

Count Three charges the defendant with the possession of fraudulently obtained authorization documents on or about September 28, 2019, and on or about May 17, 2023, in violation of 18 U.S.C. § 1546(a).[5] It is alleged that the defendant possessed a fraudulently obtained naturalization certificate and a Social Security card in connection with his application for a "Real Credential" in 2019, and again at his home on the date of his arrest in May 2023. The elements of the offense are:

<u>First</u>, that on or about September 28, 2019, or May 17, 2023, the defendant knowingly possessed a document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, in this case either a United States Department of Homeland Security Certificate of Naturalization, or a Social Security card;

<u>Second</u>, the Certificate of Naturalization or the Social Security card was procured by means of a false statement, fraud, or otherwise unlawfully obtained; and

<u>Third</u>, the defendant knew the certificate of naturalization or Social Security card was procured by means of a false statement, fraud, and otherwise unlawfully obtained.

## Counts IV – VI: False Statements to HSI Agents

Counts Four through Six of the Superseding Indictment charge the defendant with making false statements to Special Agents of the Department of Homeland Security on three

---

[5] That statute reads in pertinent part: "Whoever knowingly . . . uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to . . . have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained . . . Shall be fined under this title or imprisoned not more than . . . 10 years . . . or both."

dates: March 22, 2022, March 28, 2022, and May 16, 2023, each in violation of 18 U.S.C. §

1001(a)(2).[6]  In an interview conducted by HSI on March 22, 2022, the defendant falsely stated

that he was "just a perimeter guard" at the Celebici prison camp, and he never hurt anyone while

a guard.  On March 28, 2022, the defendant falsely told HSI agents again that he did not hurt

anyone at the Celebici camp.  In his final interview with agents on May 16, 2023, the defendant

falsely stated that he never saw other guards at the camp hurting prisoners, and that he did not

participate in "any kind of hurting [of] another human being."  The elements of each of these

offenses are:

> First, that the defendant knowingly made a material false statement;
>
> Second, that the defendant made the statement voluntarily and intentionally; and
>
> Third, that the defendant made the statement in a matter within the jurisdiction of the executive branch of the United States government.

**Count VII: Scheme to Conceal Participation in Direct or Indirect Persecution**

Count Seven the Indictment charges the defendant with engaging in a scheme to conceal

and covering up one or more material facts beginning in March 1998 and culminating on May

16, 2023, in violation of 18 U.S.C. § 1001(a)(1).[7]  The fact the defendant concealed was that he

participated in the direct and indirect persecution of one or more persons because of race,

------

[6] That statute reads in pertinent part: "whoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully— . . . (2) makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, imprisoned not more than 5 years . . . or both."

[7] That statute reads in pertinent part: "whoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully . . . falsifies, conceals, or covers up by any trick, scheme, or device a material fact . . . shall be fined under this title, imprisoned not more than 5 years . . . or both."

religion, national origin, membership in a particular social group, and political opinion while he was a guard and supervisor at the Celebici prison camp.  The elements of Count Seven are:

> First, the defendant concealed or covered up by trick, scheme, or device a material fact;
>
> Second, that the defendant did so knowingly and willfully;
>
> Third, the subject matter involved was within the jurisdiction of any department or agency of the United States; and
>
> Fourth, the defendant engaged in at least one affirmative act of concealment at some point after July 8, 2019.

## IV.   TRIAL ISSUES

The government anticipates that several evidentiary and instructional issues will arise at trial and outlines below its position on these issues.  While the defendant has shared with the government one expert disclosure, the names of its witnesses, and several exhibits, the defendant has not produced any reciprocal discovery to the government.  As a result, the nature and scope of the defense in this case is not entirely clear, and the government is making initial predictions based on the limited information available.  In the event the defendant produces discovery or submits a trial brief, the government requests the opportunity to supplement this filing.

### A.   Unique Issues with Survivor Testimony

Over the last 30 months undersigned counsel has interviewed nearly two dozen survivors of persecution during the Bosnian War in 1992 and, in another unrelated case, an equal number of survivors of genocidal violence in Rwanda in 1994.  To say that these witnesses present unique challenges is a gross understatement.  While the conflicts in Bosnia and Herzegovina ("BiH") and Rwanda were very different, survivors present many similar features.  Foremost among the similarities is that recounting their trauma through interviews and testimony plainly

retraumatizes them.  The Court will undoubtedly observe that as these witnesses recount the details of their experiences they will be visibly in pain.

Other unique issues with these witnesses include: the violence perpetrated against them extended over many months rather than in a single instance; the persecutors were part of a group rather than an individual; their persecution was coupled with the deprivation basic needs such as adequate food, water, sleep, and medical care; virtually all had close family and friends who were killed or tortured (often in their presence); the violence inflicted on them was designed to place them in maximum fear and they were often told that if they looked at their attacker, the attack would be worse; many continue to feel guilty that they have survived while their parents, wives and siblings did not; many, at some point, wished they had been killed rather than endure survival; and nearly all actively seek to suppress and forget their traumatic experiences so as to find some sense of normalcy.  All these factors are coupled with the fact that the trauma was inflicted 30 years ago; communication and testimony is inhibited by interpretation and language barriers; and cultural differences (particularly including the use of idioms and parables) need to be explained and bridged.  As a result, presenting and assessing survivor testimony in this and similar cases is uniquely challenging.

In preparing these witnesses for trial the government has made substantial efforts to explain the role of the Court, the rules of evidence, the nature of examination and cross-examination, and to focus their testimony on matters directly relevant to the crimes charged.  The government will continue to do so as it prepares for trial.  However, many of these witnesses have difficulty following these guidelines.  Similarly, many of them have great difficulty recounting events in a chronological fashion and providing more detail on more critical matters and less detail on less critical matters.  These characteristics of survivor testimony are well

documented by social scientists and psychologists. *See, e.g.* Thor Paulson, et al., "Toward A Trauma-Informed Approach To Evidence Law: Witness Credibility And Reliability," LA REVUE DU BARREAU CANADIEN. Vol. 101 (2023) (concluding that Canadian trial practice rules "are inconsistent with modern knowledge of how trauma affects both memory and demeanor," and proposing a "a trauma-informed approach to witness credibility assessments"); Laura Marschner, "Implications of Trauma on Testimonial Evidence in International Criminal Trials," in Philip Alston, and Sarah Knuckey (eds), *The Transformation of Human Rights Fact-Finding* (New York, 2016; online ed., Oxford Academic, 21 Jan. 2016) at 214 ("the process of testifying about their suffering within the structured forensic setting of the criminal trial can be highly stressful and emotional for traumatized witnesses."); Kenneth J. Weiss and Alisa R. Gutman, "Testifying About Trauma: A Call for Science and Civility," Journal of the American Academy of Psychiatry and the Law Online Mar 2017, 45 (1) 2-6, at 4 ("Traumatic events create enduring changes within the nervous system that affect not only an individual's experience and memory, but also his predispositions, attitudes, and physical adaptations. These phenotypic variations have the potential to alter and inform posttrauma behavior, which may become the subject of criminal or civil litigation").

As a result, the government respectfully requests that the Court give these witnesses some leeway as they testify about their capture and detention at Celebici. To the extent that the witnesses unexpectedly stray beyond the bounds of the rules, the government respectfully requests that the Court provide limiting instructions to the jury rather than admonishments to the witness or the prosecution. While the government has made, and will continue to make every effort to keep the witnesses within the bounds of the evidentiary rule – including by asking each

witness to recount only those things they personally saw, heard, or experienced -- doing so while respecting the dignity and ongoing trauma of these survivors will remain challenging.

With regard to assessing survivor testimony, the types of standard jury instructions requested by the defendant, *see, e.g.* [D.105 at Proposed Instructions 5, 6, 8], must be modified to reflect the unique nature of survivor testimony.  By way of example only, in the United Kingdom (one of the few jurisdictions other than the United States which has a jury system), courts are providing juries 'trauma-informed" instructions rather than the more traditional witness credibility instructions:

> Just because W has not given a consistent account does not necessarily mean that W's evidence is untrue. Experience has shown that inconsistencies in accounts can happen whether a person is telling the truth or not. This is because if someone has a traumatic experience such as the kind alleged in this case, their memory may be affected in different ways. It may affect that person's ability to take in and later recall the experience. Also, some people may go over an event afterwards in their minds many times and their memory may become clearer or can develop over time. But other people may try to avoid thinking about an event at all, and they may then have difficulty in recalling the event accurately. Your assessment of this factor will be influenced by your conclusions as to the facts of this case. You must form a view of what happened in this case based on all the evidence you have heard.[202]

*See* Thor Paulson, *et al., supra citing* Maddison *et al.*, "The Crown Court Compendium:  Part I Jury and Trial Management and Summing Up" (June 2022) at 20-7, https://perma.cc/6NEB-97V8.

These instructions account for the fact that survivors of trauma present differently, testify differently, and their credibility must be evaluated differently than other witnesses.  Thus, in addition to requesting that the Court give these witnesses some leeway in testifying about their traumatic experiences, the government will submit an instruction which takes into account factors unique to individuals who have experienced trauma over an extended period.

**B.**      **Disputed Government Exhibits & Rule of Completeness**

The government has submitted a list of proposed exhibits, including those exhibits to which the defendant has objected, and the government's initial response. [D.92-1].   Among the most significant objections are the defendant's objections to government Exhibits BB, CC, DD, KK, LL, MM, and NN pursuant to Rule 106 (completeness).  The first three exhibits are sworn statements the defendant made in 1996 in connection with the investigation and prosecution of crimes at the Celebici camp conducted by the International Criminal Tribunal for the Former Yugoslavia ("ICTY").  The remainder of these exhibits are four short portions of three recorded interviews the defendant gave to HSI agents in 2022 and 2023.  The defendant has just identified for the government those additional portions of the statements and recordings he believes are necessary to complete the statements to be offered by the government.  On September 16, the defendant filed two motions *in limine* on this topic. [D.108, D.109].  The government will endeavor to respond to these motions prior to the pretrial conference.

The government notes that as a general matter, the burden is on the defendant to identify and demonstrate which other portions of each of these statements are necessary to correct "distortions or misunderstandings" of those portions to be offered by the government. *See United States v. Altvater*, 954 F.3d 45, 49–50 (1st Cir. 2020) (defendant bears burden of showing, through a "granular level of analysis," how the government's redactions created a misunderstanding or distortion); *United States v. Bucci*, 525 F.3d 116, 134 (1st Cir. 2008) (affirming the district court's determination that the rule of completeness did not require presentation of redacted portions of testimony in part because the appellant failed "to point to specific portions" of excerpted testimony "that might suggest prejudicial ambiguity").

While many defendants attempt to use Rule 106 to offer into evidence unreliable self-serving statements which cannot be then cross-examined by the government, courts have routinely prohibited defendants from doing so.  *See, e.g.  Altvater*, 954 F.3d at 49–50; *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir.), *on reh'g*, 196 F.3d 383 (2d Cir. 1999) (where government offered into evidence 90 seconds of a 42 minute tape, upholding district court's decision to keep remaining portions out); *United States v. Hird*, 913 F.3d 332, 355 (3d Cir. 2019); *United States v. Ramos-Caraballo*, 375 F.3d 797, 804 (8th Cir. 2004) (finding error in "wholesale" admission of evidence without requiring the party to "specify the portions that were relevant to the issues allegedly taken out of context").   Rule 106 serves a very narrow purpose: to prevent the jury from being misled by reading or hearing a statement "out of context." *Id*.; Fed. R. Evid. 106 Advisory Committee's Note to 1972 proposed rules.  As the First Circuit has noted,

> Rule 106 is not a pathway to the admission of otherwise inadmissible portions of a writing or recorded statement merely because some distinct portions of that writing or statement are admissible. . . [The defendant] has the burden of showing how the government's redactions created a misunderstanding or distortion that could <u>only</u> be averted by the introduction of the full text of the out-of-court statement . . .

*Altvater*, 954 F.3d at 49–50 (*internal quotes and citations omitted, emphasis in the original*).

## C.    Defendant's Character Evidence and Government's Cross-Examination and Rebuttal

The defendant's proposed jury instructions and witness list suggest that he intends to offer evidence of his "reputation for honesty, truthfulness and integrity in his community." [D. 105 at Instruction 15; D.99 (witness list)].  As a general matter, evidence of a person's character is not admissible to prove action in conformity with such.  *See* Rule 404(a).  This is so because character evidence by its nature can be unreliable and unfairly prejudicial.  *Michelson v. United States*, 335 U.S. 469, 473-480 (1948).  However, Rule 404(a) provides an exception to this

general rule and allows an accused to introduce "[e]vidence of a pertinent trait of his character." The word "pertinent" is synonymous with "relevant." *United States v. Santana-Camacho*, 931 F.2d 966, 968 (1st Cir. 1991) ("traits of character 'pertinent' to the crime charged must be relevant . . . [the pertinent trait must] make any fact 'of consequence to the determination of the case [significantly] more or less probable than it would be without evidence of the trait.'" *quoting United States v. Angelini*, 678 F.2d 380, 381 (1st Cir. 1982)).

In this case, the government does not dispute that a reputation for honesty and truthfulness is pertinent to Counts Four through Seven of the Superseding Indictment which charge violations of 18 U.S.C. § 1001.  However, under Rule 405, the defendant's character witnesses must be restricted to testifying about their opinion of the relevant character trait or their knowledge of defendant's reputation in that regard. *See* Fed. R. Evid. 405(a).  They may not testify about specific instances of conduct. *Id.*; *Michelson*, 355 U.S. at 477; *State of Arizona v. Elmer*, 21 F.3d 331, 335 (9th Cir. 1994).  Moreover, the defendant's witnesses may not testify about commendations or awards the defendant received, or instances when the defendant told the truth or otherwise demonstrated honesty.  *See, e.g. United States v. Barry*, 814 F.2d 1400, 1403 (9th Cir. 1987) (upholding exclusion of letters of commendation as hearsay and not admissible under Rule 405).  This is so because a defendant's character of honesty or truthfulness is not an essential element of a charge under 18 U.S.C. § 1001 that would support admission of evidence regarding specific instances of conduct under Fed. R. Evid. 405(b).  *See, e.g. United States v. Covington*, No. 2023 WL 8482581, at *3 (E.D. Va. Dec. 7, 2023) ("the character trait of truthfulness is not an essential element of . . . § 1001" and therefore defendants "cannot use evidence of specific instances . . . to prove their truthful character"); *United States v. Mixon*, 2015 WL 13849032, at *3 (D. Ariz. Dec. 11, 2015) (character trait of honesty is not an element

of 18 U.S.C. § 1001).  The ability to introduce specific instances of conduct is narrowly confined because "evidence of specific instances of conduct . . . possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." Fed. R. Evid. 405 Advisory Committee's Note to 1972 Proposed Rules.

Equally important with regard to the presentation of character evidence is that once the defendant offers opinion or reputation testimony, the government is given wide latitude to cross-examine those witnesses about their knowledge of specific instances of the defendant's dishonesty, and the government is permitted to call rebuttal witnesses to testify about such specific instances.  The Supreme Court's decision in *Michelson* is the preeminent authority on issues regarding character testimony, and includes the following discussion about the scope of cross-examination of character witnesses:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat — for it is not the man that he is, but the name that he had which is put in issue. Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

*Michelson* 355 U.S.at 479.

Fed. R. Evid. 405(a) codified the rationale of *Michelson*, making clear that character witnesses may be cross-examined about specific instances of misconduct that are relevant to the character traits in question. The cross-examination of a character witness may even include inquiries which are not otherwise allowed.  For example, it is generally impermissible to

introduce extrinsic evidence or cross-examine a defendant about whether he has been arrested for or committed past misdeeds unrelated to the charged offense. Nonetheless, if a character witness testifies for a defendant, the cross-examination may include inquiry about the defendant's past wrongful acts. *See Michelson*, 335 U.S. at 482; *United States v. Collins*, 779 F.2d 1520, 1532 (11th Cir. 1986); *United States v. Glass*, 709 F.2d 669, 673 (11th Cir. 1983); *United States v. Bynum*, 566 F.2d 914, 919 (5th Cir. 1980).

### D.       Anticipated Scope of the Defense Evidence: Serb & HVO Violence on Muslims

The defendant's expert disclosure [D.85-1], his response to the *Government's Motion in Limine To Exclude Certain Testimony Of Defense Expert Jasmin Mujanovic* [D.102], and the proposed defense exhibits showing the physical damage to the defendant's Konjic apartment during the Bosnian War [D.100 at Exhibit D-F, D-G, D-H, D-I, D-J, D-K] suggest that the defendant seeks to inject into this case irrelevant and confusing evidence of Serb and Croat/HVO attacks on Bosniak Muslims, and other atrocities committed against Bosniaks during the Bosnian War. The expert testimony and photographs also suggest that the defense will seek to introduce evidence of wartime conduct which occurred months, if not years, after Celebici camp closed in 1992. *See, e.g.* [D.100 at Exhibit D-M (recent photograph of post-war soldiers' memorial wall)].

This defense effort, common in ICTY cases and other cases arising from war zones, amounts to a form of jury nullification which seeks to justify or muffle the specific criminal acts of a defendant by demonstrating that other combatants – in this case, mainly Serbs -- committed similar or worse criminal acts. This Court should exclude or narrowly confine such evidence under Rule 403 as "confusion of the issues" and "misleading the jury." The exclusion or limitation placed on such evidence is particularly important when much of that confusing evidence is offered through an expert witness. *See United States v. Pires*, 642 F.3d 1, 12 (1st Cir. 2011) (expert

evidence "presents a special level of complexity in constructing the balance between probative value and unfairly prejudicial effect. This complexity arises out of the concern that, because of an expert's stature *qua* expert, jurors may assign more weight to expert testimony than it deserves")

The focus of the government's case, with respect to Counts Four through Seven, will be on the specific acts committed by the defendant and other guards on the Serbs held captive in Celebici.  It will also include evidence of their anti-Serb purpose for their actions from the words they spoke in transporting and detaining prisoners at Celebici.  It is not relevant what Serbs or Croats did to Muslim civilians or combatants at other locations during or after the operation of the Celebici camp or in other regions of BiH.  While the defendant may attempt to explain or justify the persecutive conduct of the Celebici guards with reference to acts committed by Serb forces or the HVO, this trial should not be a forum for determining which forces committed the worst atrocities throughout a three-year war.  Instead, consistent with the rules of evidence, the focus of the trial must be on the defendant's actions and inactions, including whether he harmed prisoners or otherwise participated in the direct and indirect persecution of Serb prisoners at Celebici.

For this reason, the government has submitted a motion *in limine* to limit the testimony of the defendant's expert to events leading up to the opening of the Celebici camp and occurrences at that camp.  [D.85].  The government also objects to the introduction of photographs depicting wartime damages to the defendant's apartment building and to the minaret of a mosque in Konjic. [8]

---

[8] The government does not dispute that armed forces around the town of Konjic -- initially made up of Serbs but which later included HVO/Croats -- fired upon the town throughout the war.  This was also true in Sarajevo and other locations in BiH.  However, how

Finally, to the extent that the defendant is permitted to introduce evidence or expert testimony of conduct beyond that committed at Celebici, the government should be permitted to put on a rebuttal case, including the testimony of Serb victims to other crimes committed by Bosniak and HVO forces.

### E.  Prior Sworn Statements and Testimony of Survivor/Victim Witnesses: Admissibility under Rule 803(5) (recorded recollection) and/or Rule 801(d)(1)(B) (prior consistent statement)

A number of survivor witnesses made written sworn statements in the years immediately after their detention at Celebici.  In addition, some of these witnesses testified under oath in *The Prosecutor v. Mucić et al*. (IT-96-21) in the ICTY in 1997-98.  In many of these statements and sworn testimony the survivors identified the defendant as among the guards who harmed prisoners at Celebici.  The government anticipates that a number of trial witness may be unable to testify "fully and accurately" as to instances of abuse at Celebici and other related events.  *See* Fed.R.Evid. 803(5).  However, the witnesses will testify that these prior sworn statements and testimony were made when the events were fresh in their minds and reflect their knowledge correctly.  *Id.*  As a result, the government may, pursuant to Rule 803(5), request that the Court (or counsel for the government) read relevant portions of their prior statements into the record as a recorded recollection.[9]  *See United States v. Picciandra*, 788 F.2d 39, 42–43 (1st Cir. 1986) (affirming district court's decision to allow government to read portions of a witness's report when the witness could no longer accurately recall events).

---

and when the damage occurred to the defendant's apartment and a mosque, and how that damage relates to events at Celebici in 1992 is entirely unclear.

[9] While the government would ordinarily have the witness read their statement into the record, the statement would first need to be translated into Serbian for the witness, then their reading of it would need to be translated back into English for the jury.  This would be both time-consuming and confusing for the jury.

Moreover, if through cross-examination of the survivor witnesses the defense suggests that their identification of the defendant or other testimony is the product of recent fabrication or improper motive, the government will offer their prior statements into evidence pursuant to Fed.R.Evid. 801(d)(1)(B)(i) as a non-hearsay prior consistent statement. *See, e.g. United States v. Chiu*, 36 F.4th 294, 300 (1st Cir.), *cert. denied*, 143 S. Ct. 336 (2022) (prior consistent statements admissible "when (1) the declarant testifies at trial and is subject to cross-examination; (2) the prior statement is consistent with the declarant's trial testimony; and (3) the prior statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive," *quoting United States v. Jahagirdar*, 466 F.3d 149, 155 (1st Cir. 2006)).  Similarly, such prior statements are admissible on redirect "to rehabilitate the declarant's credibility as a witness when attacked on another ground," such as inconsistency or faulty memory.  Fed.R.Evid. 801(d)(1)(B)(ii); 2014 Amendments to Rule 801(d)(1)(B) ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as the charges of inconsistency or faulty memory.")

### F.      Jury Questionnaire

In addition to submitting an extensive list of voir dire questions, the defendant has requested that each prospective juror complete a written questionnaire. [D.103, D.104].  The government opposes the use of a jury questionnaire as unnecessary in this case.  This matter has not garnered significant media attention and questions related to ethnicity and religion can be effectively addressed through general questions to the jury venire and through individual voir dire as necessary.  None of the other issues presented by this case warrant the use of a questionnaire.

In addition, the Court has currently scheduled nine trial days for this matter, running from 9 a.m. to 4 p.m.  Absent the use of a written jury questionnaire, the government anticipates that a jury will be selected in the first day of trial with opening statements and potentially one witness to follow.  A jury questionnaire will undoubtedly alter this schedule. Because the great majority of the government's witnesses are traveling substantial distances to testify (a number are travelling internationally), and the trial is to be interrupted with a three-day weekend, scheduling witness travel must be planned substantially in advance of trial.  As a result, if the Court decides to use a written questionnaire, the government respectfully requests that the Court make this determination as early in the process as possible.  In addition, the government requests that the Court establish a schedule for the review of the questionnaires, voir dire, and when the parties can expect opening statements to take place.

### G.      Transcripts of Recorded Interviews

As reflected in the list of proposed government exhibits [D. 92, Exhibits KKtr, LLtr, MMtr, NNtr], the government intends to introduce four clips from three audio-recorded conversations between the defendant and HSI Special Agents. The government has prepared transcripts of each of these clips and has provided them to the defense for review.  The defendant has provided proposed corrections, which the government is currently assessing.

The government intends to provide the Court and each juror with a binder which includes the transcripts to assist the jurors in listening to the recordings.  In addition, the government will ask to have one copy of each transcript marked for identification and will request that one set of transcripts be provided to the jury during deliberations. *See gen. United States v. Young*, 105 F.3d 1, 10-11 (1st Cir. 1997) (approving use of transcripts to aid jurors in listening to recorded conversations).

**H.      Pending Motions *in Limine.* Motion to Seal, Motion to Dismiss for the Court's Resolution**

In addition to the evidentiary issues outlined in this memorandum, the government has submitted the following motions *in limine* and motion to seal, to which the defendant has responded:

*Government's Motion in Limine to Exclude Certain Testimony Of Defense Expert Jasmin Mujanovic.* [D.85]. Defendant's opposition is at [D.102].

*Government's Motion in Limine to Admit Bosnian Military Records* [D.86].  Defendant's opposition is at [D.101].

*Government's Motion to Seal Complete List of Prospective Trial Witnesses and for Protective Order* [D.87].  The defendant's initial response is contained within the government's motion at pp. 3-4.

The defendant has submitted the following motion to dismiss and motions *in limine*, to which the government has responded:

*Defendant's Renewed Motion to Dismiss* [D.78].  The government has responded at [D.91].

*Defendant's Motion in Limine to Exclude References To Čelebići as a "Concentration Camp" And to Limit Testimony About Nazi Slogans and Insignia* [D.79].    The government's response is at [D.93].

*Defendant's Motion in Limine to Exclude Testimony Not Based on Personal Knowledge*, *etc.* [D.80].  The government's response is at [D.94].

*Defendant's Motion in Limine to Exclude "Military Investigating Commission" Document.* [D.81].  The government's response is at [D.106].

*Defendant's Motion to Reserve the Right To File Further Motions in Limine* [D.82].  The government's response is at [D.97].

*Defendant's Motion in Limine to Exclude SM's A-File Documents* [D.83]. The government's response is at [D.89].

*Defendant's Motion in Limine to Prohibit the Use of The Term "Survivors" Or "Victims"* [D.84].  The government's response is at [D.95].

The defendant has recently submitted the following two motions in limine to which the government has yet to have an opportunity to respond:

> *Defendant's Opposition to Government's Offer To Introduce Certain Excerpted Portions Of Mr. Mrndzic's Interview With Law Enforcement On March 22, 2022 And Identification Of Additional Portions* [D.108].

> *Defendant's Opposition to Government's Offer to Introduce Portions of Mr. Mrndzic's Statements in ICTY Case and Identification of Additional Portions* [D.109].

Respectfully submitted,

JOSHUA S. LEVY
ACTING UNITED STATES ATTORNEY
District of Massachusetts

By:    *s/ John T. McNeil*
John T. McNeil
Jason A. Casey
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that these documents are being filed through the ECF system and therefore will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*s/ John T. McNeil*
John T. McNeil
Assistant U.S. Attorney

Date: September 17, 2024